# In the United States Court of Federal Claims

No. 16-362C

(Filed: April 28, 2016)

| | |
|---|---|
| **NATIONAL AIR CARGO GROUP, INC.,** ) | Bid protest; multiple awards of indefinite-delivery/indefinite-quantity contracts; challenge by one of the awardees to a later award of an additional contract; statutory prerequisites for a bid protest; 28 U.S.C § 1491(b)(1); standing; dispute over applicability of the Competition in Contracting Act to the later award |
| **Plaintiff,** ) | |
| v. ) | |
| **UNITED STATES,** ) | |
| **Defendant,** ) | |
| **and** ) | |
| **UNITED AIR LINES, INC.,** ) | |
| **Defendant-Intervenor.** ) | |

Milton C. Johns, Fluet, Huber + Hoang, PLLC, Woodbridge, Virginia, for plaintiff.

Aaron E. Woodward, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C. for defendant.  With him on the briefs were Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Civil Division, Robert E. Kirschman, Director, and Douglas Mickle, Assistant Director, Civil Division, United States Department of Justice, Washington, D.C.  Of counsel was Karen L. Tibbals and Peter B. Ries, Acquisition Attorneys, United States Transportation Command, Scott Air Force Base, Illinois, and Lieutenant Colonel Aaron G. Lake, Deputy Chief, Commercial Litigation Field Support Center, United States Air Force, Andrews Air Force Base, Maryland.

David S. Cohen, Cohen Mohr, LLP, Washington, D.C. for defendant-intervenor.  With him at the hearing was Daniel J. Strouse, Cohen Mohr, LLP, Washington, D.C.

## OPINION AND ORDER

LETTOW, Judge.

The United States Transportation Command ("TRANSCOM" or "government") awarded five indefinite-delivery/indefinite-quantity contracts in June 2015 for multi-modal international shipping of Department of Defense and other government-approved cargo.  Plaintiff National Air Cargo Group, Inc. ("National") was one of the awardees. The following month, the government

awarded a sixth contract to United Air Lines, Inc. ("United").  National then submitted protests regarding the sixth award to the Government Accountability Office ("GAO") and this court, resulting in TRANSCOM's agreement to take corrective action to reevaluate past performance for all TRANSCOM offerors.  Subsequently, TRANSCOM reaffirmed the awards made to each of the six successful offerors.  That action prompted this renewed protest.

At this juncture, National alleges that the government's decision to award a contract to United violated terms of the solicitation limiting awardees, as well as applicable statutes and regulations, and was also irrational because United lacks past performance history in multi-modal international shipping.  Compl. at 1.  The government has filed a motion to dismiss pursuant to Rule 12(b)(1) of the Rules of the Court of Federal Claims ("RCFC"), arguing that National, as an awardee, lacks standing to protest an award of a contract to another offeror in this multiple-award indefinite-delivery/indefinite-quantity procurement.  Def.'s Mot. to Dismiss ("Def.'s Mot."), ECF No. 11.  National has filed a cross-motion for a preliminary injunction and an application for a temporary restraining order pursuant to RCFC 65.  Pl.'s Mot. for Injunctive Relief ("Pl.'s Mot."), ECF No. 12.[1]  United was granted leave to defend the award.  Order of Mar. 24, 2016, ECF No. 10.  A hearing was held on April 13, 2016.[2]

## FACTS AND BACKGROUND[3]

*A. TRANSCOM Requests Proposals for an Indefinite-Quantity Contract for International Shipping Services, Selects Five Contractors for Award, and then Later Makes a Sixth Award*

On February 12, 2015, the government issued a request for proposals ("RFP") for international multi-modal transportation of government cargo.  Compl. ¶ 5.[4]  The RFP provided

---

[1]National also filed a supplemental request for a temporary restraining order, ECF No. 29, after TRANSCOM issued a Request for Quotation pursuant to the indefinite-delivery/indefinite-quantity contracts.  The defendants have filed responses in opposition to this supplemental request.  ECF Nos. 30, 31.

[2]At the hearing, the court raised jurisdictional precedents that had not been addressed by the parties in their briefing of the competing motions.  Immediately thereafter, United filed a Motion for Leave to File Responses to the Court's Inquiries, ECF No. 21.  The court granted that motion, Order of Apr. 14, 2016, ECF No. 22, and the parties each submitted supplemental briefs on April 18, 2016, ECF Nos. 26, 27, 28.

[3]This recitation is drawn from the complaint's allegations, the attached solicitation, and declarations submitted by the parties.  The court has found jurisdictional facts with respect to standing.  *See Land v. Dollar*, 330 U.S. 731, 735 n. 4 (1947) ("[W]hen a question of the [d]istrict court's jurisdiction is raised, . . . the court may inquire by affidavits or otherwise, into the facts as they exist."), *overruled by implication on other grounds by Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682 (1949); *see also Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1584 (Fed. Cir. 1993); *Midwest Tube Fabricators, Inc. v. United States*, 104 Fed. Cl. 568, 574 (2012).

[4]Solicitation number HTC711-15-R-R001.

2

that "[t]his is an indefinite-quantity contract for the supplies or services specified, and effective for the period stated."  Compl. Ex. 1 (setting out a 90-page excerpt of the RFP) ("RFP") at 9, ECF No. 1-1 to 1-3.[5]  An "indefinite-quantity" contract, also known as an indefinite-delivery/indefinite-quantity ("IDIQ") contract, is a contract by which the government promises to buy a stated minimum and the contractor agrees to sell or provide a stated maximum.  48 C.F.R. ("Federal Acquisition Regulation" or "FAR") § 16.504(a)(1); *see also* John Cibinic, Jr., et al., *Formation of Government Contracts* 1386 (4th ed. 2011).  Once an IDIQ contract is awarded, the government issues task or delivery orders to the IDIQ contract holder to fulfill its requirements.  In some instances, the government awards one IDIQ contract to one contractor.  But in many cases, the government awards multiple IDIQ contracts under one solicitation, thereby creating a pool of contractors who compete with each other for task orders.  *See, e.g.*, FAR § 16.504(c)(1)(i) (requiring the contracting officer to "give preference" to making multiple awards); FAR § 16.505(b)(1)(i) (providing that each awardee under a multiple-award contract must have an opportunity to compete for any order exceeding $3,500).

The RFP in this instance established that the government would award multiple IDIQ contracts to bidders offering the "best value" to the government, based on four factors: quality of business proposal, technical ability, price, and past performance history.  RFP at 87-88.  With respect to past performance, the government would give each offeror a "confidence assessment" of either substantial confidence, satisfactory confidence, limited confidence, or no confidence.  RFP at 89.  If an offeror had "no recent/relevant performance" of record, then the offeror would receive an "unknown confidence" rating, which would be "treated neither favorably nor unfavorably."  *Id.*

Using this evaluation scale, TRANSCOM advised that it would "award approximately four (4) IDIQ contracts," which would give the government "flexibility of choice and service coverage."  RFP at 87.  The selection of these winners would "initially establish the awardee pool."  RFP at 52.  This pool of awardees would then compete for task orders issued by TRANSCOM.  *Id.*

Pursuant to FAR § 16.504(a)(1), which requires a minimum task order for each winner, the RFP provided that the government would purchase a minimum of $2,500 of international shipping services from each awardee.  RFP at 4.  The solicitation set the maximum total dollar amount for all task orders at $296,448,852.21.  *Id.*  In essence, each winner thus would compete for up to $296 million in task orders.

The RFP set out a condition bearing on additional awards.  In certain circumstances, the RFP permitted the government to "reopen" the competition to add additional contractors to the pool:

---

[5]All citations are to the page numbers of the 90-page RFP excerpt, not the page numbers assigned to the exhibit by CM/ECF.

**1. Recompetition**

1.1  The Government will initially establish the awardee pool by competitively awarding multiple-award IDIQ contracts.  *As future task order requirements within the program ceiling totals materialize, over the life cycle of this program, the Government will compete those requirements amongst all existing IDIQ contract holders to determine if the contract holders can adequately fulfill the needed capability.  The Government reserves the right to reopen the competition under this solicitation if there is [a] shortfall in meeting the requirements among the existing IDIQ contract holders or if it is in the Government's best interest to add new contractors to the original pool of IDIQ contract holders.*  When/if the Government decides to reopen the solicitation, an announcement will be posted via FedBizOps allowing new . . . offerors the opportunity to compete in a full and open competition for an IDIQ contract and task orders to meet the new requirements.  Any existing IDIQ contract holder will not re-compete for an IDIQ contract.  The competitions will use the same evaluation methodology and documentation (updated to reflect changes in regulatory provisions, requirements and certifications) as the original competition.

RFP at 52.  After adding new contractors to the IDIQ pool, the government would continue soliciting task orders from the expanded pool: "Once a new awardee(s) is selected, that awardee(s) will be included in the awardee pool and will compete for future task orders.  Subsequent to a reopened competition, initial and new IDIQ awardees can compete for future task orders."  *Id.*

The RFP required offerors to submit proposals by March 16, 2015.  RFP at 1.  Submissions by this deadline would trigger a 180-day "[p]eriod of acceptance of offers," during which time each offeror "agrees to hold the prices in its offer firm."  RFP at 86.  In response to the RFP, National submitted a bid.  Compl. ¶ 9.  On June 11, 2015, the government awarded IDIQ contracts to National and four other bidders.  Compl. ¶ 9.[6]  On July 17, 2015, however, the government announced a sixth award, this time to United.  Compl. ¶ 10.  The five initial awardees had no notice of a possible additional award, nor did TRANSCOM reopen the competition under the RFP's terms.  Compl. ¶ 10.  National alleges that this action by TRANSCOM violated the Competition in Contracting Act, codified as amended in part in scattered sections of Title 41 of the United States Code, especially 41 U.S.C. §§ 1708, 3701-08.  *See* Compl. at 1.  National also asserts that the award was irrational because United has no experience in the type of "multi-modal" shipping services required by the RFP.  *See* Compl. ¶¶ 51-57.

National and the government agree that United will be "a significant source of competition at the task order level," and United does not oppose that characterization.  Def.'s

---

[6]The defendants dispute whether National is an "actual" bidder as a matter of law.  *E.g.*, Def.'s Mot. at 4.  But as a matter of fact, National submitted a bid and won a contract.  That a contractual award was made pursuant to National's bid does not elide or render ineffective National's action in submitting a bid.

Opp'n to Pl.'s Mot. for a Prelim. Inj. ("Def.'s Opp'n") at 9, ECF No. 15; Pl.'s Reply to Def.'s
Opp'n ("Pl.'s Reply") at 3, ECF No. 20; Def.-Interv.'s Support of Mot. to Dismiss and Resp. to
Mot. for Prelim. Inj. ("Def.-Interv.'s Resp."), ECF No. 13 (not disputing that assertion).[7]

   B. *National Files a Series of Protests Challenging the Government's Award to United*

       National filed a bid protest with GAO on July 27, 2015, arguing that TRANSCOM's
decision to award six contracts violated the RFP's limitations on awards. Compl. Ex. 3 ("First
GAO Protest") at 4-5. National argued the five initial awardees constituted the "original pool"
under the RFP, meaning that the government could not award any further contracts unless and
until it complied with the RFP's reopening provisions. First GAO Protest at 5. Because the
government had not found a "shortfall" in meeting its requirements within the existing five-
contractor IDIQ pool, National contended that the task order pool could not be reopened. *Id.* at
4-5. National also argued that United lacked past performance history in "multi-modal"
transportation, making the government's award decision irrational. *Id.* at 5. On September 24,
2015, GAO summarily dismissed the protest, citing GAO policy: "we generally will not review a
protest that has the purpose or effect of reducing competition to the benefit of the protestor."
Compl. Ex. 4 at 2 (*National Air Cargo Grp., Inc.*, B-411830 (Comp. Gen. Sept. 24, 2015) ("First
GAO Decision")). Accordingly, GAO would "not consider the merits of the protester's
allegations, which, in essence, seek to limit the agency's discretion to increase the pool of
competition among the IDIQ contract holders." First GAO Decision at 2.

       Not satisfied with this result, National filed a protest in this court on October 13, 2015
alleging the same errors that it asserted in its GAO protest. Compl., *National Air Cargo Grp.,
Inc. v. United States*, No. 15-1191 (Fed. Cl. Oct. 13, 2015). In response, the government decided
to take corrective action, informing the court that it would be "re-evaluating all offerors' past
performance," "conducting limited discussions (if needed) with the offerors concerning their past
performance," and "making a new award decision." Def.'s Notice of Corrective Action and Mot.
to Stay Briefing at 1, *National Air Cargo Grp., Inc. v. United States*, No. 15-1191 (Fed. Cl. Oct.
19, 2015). The government then filed a motion to dismiss the complaint as moot, which
National did not oppose and which the court granted. Order of Dismissal, *National Air Cargo
Grp., Inc. v. United States*, No. 15-1191 (Fed. Cl. Nov. 30, 2015). On January 21, 2016,
TRANSCOM completed its corrective action and announced that it would again make six
awards, including awards to National and United. Compl. Ex. 6.

       National again protested this decision, filing with GAO on January 27, 2016 and alleging
the same errors as in its prior protests. Compl. Ex. 7. Again, GAO dismissed the protest.
Compl. Ex. 8 (*National Air Cargo Grp., Inc.*, B-411830.2, 2016 WL 1055743 (Comp. Gen. Mar.
9, 2016) ("Second GAO Decision")). Unlike GAO's first decision, which dismissed the protest
on the policy ground that GAO would not hear protests to decrease competition, the second GAO

_____

       [7]The government's brief in opposition to plaintiff's request for an injunction cites
United's website to support a proposed finding that "[t]he award to United would allow the
[g]overnment access to a worldwide corporation that possesses over 700 mainline aircraft and
conducts over 5,000 flights every day to six continents." Def.'s Opp'n at 9 n.2 (citing
http://ir.united.com/company-information/company-overview).

decision dismissed National's protest for failing to satisfy the standing requirements of 4 C.F.R. § 21.0(a)(1), which provides that "a protester must be an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of a contract or the failure to award a contract." Second GAO Decision at 4. Without analyzing the specific text of this definitional regulation, GAO summarily concluded that a "protester is not an interested party where it would not be in line for contract award were its protest to be sustained." *Id.* Because GAO found that National was "an existing contract awardee" of an IDIQ contract, it concluded National was "not an interested party" and dismissed the case. *Id.*

Not deterred by GAO's second dismissal, National filed a protest again in this court on March 21, 2016, making the same allegations as in its prior complaint. On March 22, 2016, the court held an initial status conference and set an expedited schedule by which the government would file a motion to dismiss for lack of standing and simultaneously National would request a temporary restraining order or preliminary injunction. Order of Mar. 22, 2016, ECF No. 8. At that time, the parties reported that the government would begin issuing task orders to the IDIQ pool on April 1, 2016. Scheduling Conf. Tr. 9:1-3 (Mar. 22, 2016), ECF No. 17 ("The [g]overnment has lifted the stop work order, and has advised the contractors that task orders will be competed . . . beginning April 1.").

## JURISDICTION

### A. *Standard for Decision Under RCFC 12(b)(1)*

The government's motion to dismiss under RCFC 12(b)(1) focuses on a contention that National lacks standing to pursue its protest. A court deciding a jurisdictional motion to dismiss must not reach the merits. *Engage Learning, Inc. v. Salazar*, 660 F.3d 1346, 1355 (Fed. Cir. 2011). "Only after this initial inquiry is completed and the Court of Federal Claims takes jurisdiction over the case does it consider the facts specific to the plaintiff's case to determine 'whether on the facts [the plaintiff's] claim f[alls] within the terms of the statutes.'" *Greenlee Cnty. v. United States*, 487 F.3d 871, 876 (Fed. Cir. 2007) (quoting *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005)); *see also Association of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970) (rejecting a standing test used by a lower court because that "test goes to the merits. The question of standing is different."); *Amador Cnty. v. Salazar*, 640 F.3d 373, 378 (D.C. Cir. 2011) ("[F]or the purposes of standing, 'we assume the merits' in favor of the plaintiff." (quoting *Parker v. District of Columbia*, 478 F.3d 370, 377-78 (D.C. Cir. 2007))); *Distributed Solutions, Inc. v. United States*, 539 F.3d 1340, 1345 & n.1 (Fed. Cir. 2008) ("A non-frivolous allegation of a statutory or regulatory violation in connection with a procurement or proposed procurement is sufficient to establish jurisdiction.").

When assessing a motion to dismiss under RCFC 12(b)(1), the court will "normally consider the facts alleged in the complaint to be true and correct." *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed. Cir. 1988). "A plaintiff bears the burden of establishing subject-matter jurisdiction by a preponderance of the evidence." *M. Maropakis Carpentry, Inc. v. United States*, 609 F.3d 1323, 1327 (Fed. Cir. 2010). If the court at any time determines that it lacks jurisdiction, it must dismiss the case. RCFC 12(h)(3).

B. *Statutory Prerequisites for Bid Protest Jurisdiction Under Paragraph 1491(b)(1)*

To exercise jurisdiction over a bid protest under the Tucker Act, as amended by the Administrative Dispute Resolution Act, Pub. L. No. 104-320, § 12, 110 Stat. 3870, 3874 (Oct. 19, 1996) (adding new 28 U.S.C. § 1491(b)(1)), the court must make two determinations.  First, it must address whether the protestor is objecting to a solicitation, proposed award, award, or violation of law "in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1).  Second, the court must determine that the protestor has standing as an "interested party."  *Id.*  These questions must be addressed in this order – first statutory jurisdiction, then standing – because the considerations pertinent to standing depend upon the nature of the protest.  *See infra*, at 10-12.

*1. Alleged violation of law "in connection with a procurement."*

The court has "jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a [f]ederal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1).  This grant of jurisdiction covers not only "pre- and post-award bid protests" but any alleged violation of law "in connection with" a procurement.  *RAMCOR Servs. Grp., Inc. v. United States*, 185 F.3d 1286, 1288-89 (Fed. Cir. 1999).  The latter provision is "very sweeping in scope.  As long as a statute has a connection to a procurement proposal, an alleged violation suffices to supply jurisdiction."  *Id.* at 1289.

Moreover, the term "procurement" is itself broad, meaning "all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services and ending with contract completion and closeout."  41 U.S.C. § 111 (defining "procurement"); *Distributed Solutions*, 539 F.3d at 1345 (relying upon this statutory definition of "procurement" to analyze protest jurisdiction); *see also Palladin Partners, Inc. v. United States*, 783 F.3d 1243, 1254 (Fed. Cir. 2015) (same).  Owing to these definitions, courts construe Paragraph 1491(b)(1) as conferring jurisdiction on this court in a wide variety of cases connected to a procurement, even in cases where the protestor does not seek the award of a contract.  *See, e.g.*, *Distributed Solutions*, 539 F.3d at 1345-46 (taking jurisdiction over a contractor's challenge to the government's internal decisions about its needs and market research); *RAMCOR*, 185 F.3d at 1289 (upholding jurisdiction where a plaintiff sought to stop an agency from overriding the automatic stay triggered by a GAO protest); *URS Fed. Servs., Inc. v. United States*, 102 Fed. Cl. 664, 669-70 (2011) (same).  To come within the latter prong of Paragraph 1491(b)(1), a protestor need only make a "non-frivolous allegation of a statutory or regulatory violation in connection with a procurement or proposed procurement."  *Distributed Solutions*, 539 F.3d at 1345 n.1.

Applying these principles here, National alleges that the government ignored limitations in the RFP regarding the procedure for selecting a second round of awardees in this multiple-award IDIQ procurement, Compl. ¶¶ 44-45, and that this action contravened the Competition in Contract Act, Compl. at 1.  These allegations are directed at a "procurement," because they allege illegality in the selection of awardees.  41 U.S.C. § 111 (defining procurement as "all stages of the process of acquiring property or services").  Allegations that the government

violated the solicitation also implicate core procurement rules such as FAR § 15.305(a), which requires the agency to "assess" bidders "solely on the factors and subfactors specified in the solicitation." *See also* 10 U.S.C. § 2305(b)(1) (same).  National's complaint thus makes non-frivolous allegations of a statutory or regulatory violation in connection with a procurement.

Despite this, the defendants argue that National cannot pursue a bid protest under Paragraph 1491(b)(1) because in their view contract awardees are categorically barred from filing bid protests.  Hr'g Tr. 22:1-13, 35:13-18 (Apr. 13, 2016), ECF No. 25; Def.'s Mot. at 4.  To support this argument, the defendants cite several cases holding that claims by an existing contractor on its contract are "contract administration" claims, which are within the exclusive remedial scheme of the Contract Disputes Act ("CDA"), codified as amended at 41 U.S.C. §§ 7102-09.  Def.'s Mot. at 4 (citing *Trailboss Enter., Inc. v. United States*, 111 Fed. Cl. 338, 340 (2013); *TigerSwan, Inc. v. United States*, 110 Fed. Cl. 336, 347-48 (2013); *Outdoor Venture Corp. v. United States*, 100 Fed. Cl. 146, 152 (2011)).  Well-established precedents hold that when the CDA applies, it is exclusive.  *Dalton v. Sherwood Van Lines, Inc.*, 50 F.3d 1014, 1017 (Fed. Cir. 1995) ("When the [CDA] applies, it provides the exclusive mechanism for dispute resolution.").  Nonetheless, circumstances can arise where a claim under the CDA might properly be coupled with a bid protest.  *See, e.g.*, *Montana Fish, Wildlife, & Parks Found., Inc. v. United States*, 91 Fed. Cl. 434 (2010) (addressing the government's attempt to terminate a trustee in alleged breach of a trust agreement, accompanied by a solicitation for bids for a successor trustee).  Additionally, in "deselection" cases, where multiple contractors compete in phases for development of a desired product, preparation of prototypes, and then ultimately production, a decision by the procuring agency to winnow or eliminate candidates by ceasing further orders from one or more of the competing awardees can prompt a protest under Paragraph 1491(b)(1).  *See, e.g.*, *OTI Am., Inc. v. United States*, 68 Fed. Cl. 108, 113-17 (2005).  These examples demonstrate that defendants' argument – that contract awardees may not file bid protests – is not always true, even though it might often be correct.  In sum, defendants' categorical argument reaches too broadly.

Indeed, the Federal Circuit has already rejected defendants' contention that contract awardees are barred from filing bid protests.  In *Systems Application & Techs., Inc. v. United States*, 691 F.3d 1374, 1381 (Fed. Cir. 2012), the Army awarded a contract to the plaintiff, SA-TECH, but then announced it would revoke the award in contemplation of a resolicitation after GAO unofficially opined that the Army's award to SA-TECH was unlawful.  *Id.* at 1379.  SA-TECH then filed suit in this court, contending that the Army's corrective action violated FAR § 15.504 and was irrational.  *Id.* at 1380.  On these facts, the government argued that SA-TECH could not protest because it was an awardee.  *Id.* at 1381-82.  As an awardee, the government insisted that SA-TECH had to proceed under the CDA.  *Id.*  The court of appeals rejected this argument in jurisdictional terms as follows: "[i]n this case, the Army had not yet implemented corrective action.  Moreover, SA-TECH *was the contract awardee*.  Neither of these facts are material to the question of jurisdiction."  *Id.* at 1381 (emphasis added).[8]

---

[8]*Systems Application* is expressly not limited to corrective action cases, because the opinion says the fact that "the Army had not yet implemented corrective action" is not "material to the question of jurisdiction."  If the Army *had* implemented the corrective action, then the case would no longer be a corrective-action case – it would instead be a regular pre-award bid protest.

Instead, the court of appeals cited the statutory definition of a "procurement" in 41 U.S.C. § 111 and asked whether SA-TECH had made an objection to a procurement. *Systems Application*, 691 F.3d at 1381. It then found that the plaintiff had alleged "violations of statutes and regulations governing the procurement process" regarding contract award as a stand-alone "basis for jurisdiction." *Id.* (citing *Systems Application & Techs. v. United States*, 100 Fed. Cl. 687, 719 (2011) (concluding that plaintiff successfully proved its allegation that the government violated FAR § 15.504, which governs the award process, among other statutes and regulations)). The plaintiff had also objected to a solicitation, which objection provided a separate basis for jurisdiction. *Id.* The court of appeals further noted that, although claims subject to the CDA are exclusive to the CDA, it is not correct that a contract awardee's claims are necessarily CDA claims. Thus "SA-TECH's attempt to enjoin the government from terminating its contract did not transform its otherwise proper protest under the Tucker Act into a claim which could only be adjudicated under the Contract Disputes Act and its concomitant procedural requirements." *Id.* at 1381.

This commentary in *Systems Application* on the CDA properly distinguishes between a CDA claim and a bid protest claim. A CDA claim is an "assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief *arising under or relating to the contract*." *Todd Constr., L.P. v. United States*, 656 F.3d 1306, 1311 (Fed. Cir. 2011) (quoting FAR § 2.101) (emphasis added). CDA claims thus allege violations of contract rights. In contrast, a bid protest claim does not allege violations of contract law, but instead alleges violations of procurement law. *See Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 77-78 (D.C. Cir. 1985) (holding that a claim is a CDA claim, and not a bid protest claim, when the "source of the right at stake" is one that "sounds genuinely in contract") (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 (D.C. Cir. 1982)). *Compare SRS Techs. v. United States*, 843 F. Supp. 740, 742-43 (D.D.C. 1994) (holding claim was a bid protest, not a CDA claim, because plaintiff did not allege violations of its contractual rights), *and K-LAK Corp. v. United States*, 93 Fed. Cl. 749, 753-54 (2010) (same), *with Information Sys. & Networks Corp. v. Department of Health & Human Servs.*, 970 F. Supp. 1, 4 (D.D.C. 1997) (holding claim was a CDA claim, not a bid protest, because plaintiff alleged violations of contractual rights). *See also Griffy's Landscape Maint., LLC v. United States*, 51 Fed. Cl. 667, 672 (2001) ("The government reads 28 U.S.C. § 1491(b)(1) more absolutely than we would. There may be circumstances where a *successful* bidder would have a direct economic interest that is affected by the award of the contract.") (emphasis in original). That distinction is critical because CDA claims must arise, as a jurisdictional prerequisite, from contractual privity with the government. *United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1550-51 (Fed. Cir. 1983); *Walsky Constr. Co.*, ASBCA No. 52772, 01-2 BCA ¶ 31557, 2001 WL 902117 (Aug. 6, 2001) (when plaintiff is both a subcontractor-not-in-privity and a prime contractor-in-privity with the United States, only its claims arising from contractual privity fall within CDA). In *Systems Application*, the plaintiff

---

Thus the court's comment shows that the corrective-action context is immaterial to its jurisdictional analysis in terms of whether the plaintiff had alleged violations of procurement law, as opposed to CDA claims. Although one court has impliedly suggested that *Systems Application* is limited to corrective-action challenges, *Trailboss*, 111 Fed. Cl. at 341 n.4, that submonition misapprehends the scope of *Systems Application*.

challenged a violation of statute and regulation regarding an award decision and solicitation, not a breach of its own contractual rights. Thus its claim was not a CDA claim.

The precedents cited by the government are not to the contrary. In each of the cases cited by the government, the court found the plaintiffs alleged a claim subject to the CDA, meaning a claim arising from plaintiffs' own contract rights. *Trailboss*, 111 Fed. Cl. at 340 (ruling where plaintiff sought, in essence, a declaratory judgment that it had not breached its contract by refusing to honor the prices it quoted in its bid); *TigerSwan*, 110 Fed. Cl. at 348 (addressing plaintiff's challenge to the termination of its contract for convenience); *Outdoor Venture*, 100 Fed. Cl. at 152 (same); *see also Kellogg Brown & Root Servs., Inc. v. United States*, 117 Fed. Cl. 764, 768 (2014) (characterizing these as cases "holding that contract awardees may not challenge agency decisions regarding *their contracts* by bringing bid protests.") (emphasis added).

In summary, a plaintiff as a contract awardee will fail to make a claim within this court's bid protest jurisdiction under Paragraph 1491(b)(1) if the claim is one for breach of its own contract. Such a claim would be a CDA claim, not a bid protest. *Coast Prof'l, Inc. v. United States*, 120 Fed. Cl. 727, 734-36 (2015), *appeals docketed*, Nos. 15-5077, 15-5101 (Fed. Cir.). Here, National alleges violations of procurement law in selecting awardees, not violations of rights arising out of its contract with TRANSCOM, so its claims cannot arise under the CDA. Like the protestor in *Systems Application*, its status as a contract awardee does not, by itself, deprive this court of bid protest jurisdiction under Paragraph 1491(b)(1).

### 2. *An "interested party" pursuant to Paragraph 1491(b)(1).*

To pursue a bid protest in this court, the plaintiff must also be an "interested party." 28 U.S.C. § 1491(b)(1). The defendants argue that National is not "interested" because it already has an IDIQ contract, and because its injury is in the form of increased competition in the task-order pool. Def.'s Mot. at 4-5; Def.-Interv.'s Resp. at 2-3. GAO, which likewise permits protests only by an "interested party," dismissed National's case on this basis, stating that a "protester is not an interested party where it would not be in line for contract award were its protest to be sustained." Second GAO Decision, at 4.

The Tucker Act does not define the term "interested party," but in 2001 the Federal Circuit held that it should be defined by reference to the Competition in Contracting Act, 31 U.S.C. § 3551(2), which states that an "interested party" is "an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract." *American Fed. of Gov't Emps., AFL-CIO v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001). The "direct economic interest" element has since been frequently litigated. In a typical post-award bid protest, the plaintiff is a losing offeror whose bid was rejected and who challenges the government's selection of another offeror as the winner. *E.g.*, *Information Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003). "Generally" in such cases, "to prove the existence of a direct economic interest, a party must show that it had a 'substantial chance' of winning the contract." *Orion Tech., Inc. v. United States*, 704 F.3d 1344, 1348 (Fed. Cir. 2013).

Nonetheless, in *Weeks Marine, Inc. v. United States*, the Federal Circuit instructs that the "substantial chance" test is not the only criterion for determining whether a plaintiff has a direct economic interest. 575 F.3d 1352, 1361-62 (Fed. Cir. 2009). Rather, "[a] protest will, by its nature, dictate the necessary factors for a 'direct economic interest.'" *Systems Application*, 691 F.3d at 1382 (citing *Weeks Marine*, 575 F.3d at 1361-62). This precept recognizes that not all protestors seek the award of a contract. *E.g.*, *Navarro Research & Eng'g, Inc. v. United States*, 94 Fed. Cl. 224, 229 (2010) (applying *Weeks Marine* when a losing offeror filed suit seeking a debriefing, rather than seeking award of a contract).

Factually, *Weeks Marine* was a situation in which the Army Corps of Engineers had for years solicited dredging services using sealed bidding procedures. *Weeks Marine*, 575 F.3d at 1355. The plaintiff, Weeks Marine, had previously won dredging contracts under that procurement method. *Id.* at 1356. The government then decided to stop using sealed bidding and instead proceed with negotiated bidding for IDIQ contracts. *Id.* at 1355. Before any bids were submitted, Weeks Marine filed suit, alleging that the government violated statutes that, in its view, required sealed bidding under the circumstances. *Id.* at 1356 (citing 10 U.S.C. § 2304(a)(2)(A)). The government responded that Weeks Marine lacked standing because (1) its injury was "borne equally by all bidders," (2) its "allegations simply amount to a critique of IDIQ contracts in general," and (3) Weeks Marine could not prove it had a substantial chance of winning a contract. *Id.* at 1360. It had no substantial chance, the government said, because no bids had been submitted and so it was unknown who had a chance of succeeding. *Id.*

The court of appeals rejected that argument by the government. It began its analysis with the proposition that the protestor must be an "actual or prospective bidder" who "possess[es] the requisite direct economic interest." *Id.* at 1359 (quoting *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1308 (Fed. Cir. 2006)). Because the "actual or prospective bidder" prong was undisputed, the court focused only on direct economic interest. On the facts, the court observed that no bids had been filed. It thus held that the context of the case presented "no factual foundation for a 'but for' prejudice analysis" as contemplated by the "substantial chance" test, making that test inapposite. *Id.* at 1361.

The court then reasoned that a one-size-fits-all "substantial chance" test for economic interest would be inconsistent with the broad language of Paragraph 1491(b)(1), "which contemplates 'an action by an interested party objecting to a solicitation for bids or proposals . . . or any alleged violation of statute or regulation in connection with a procurement.'" *Weeks Marine*, 575 F.3d at 1362. Because of the different context, the court held that a plaintiff in such cases must instead demonstrate "a non-trivial competitive injury which can be redressed by judicial relief." *Id.* (quoting *WinStar Commc'ns, Inc. v. United States*, 41 Fed. Cl. 748, 763 (1998)). This test "strikes the appropriate balance" between the language of the statute and constitutional Article III standing requirements. *Id.*; *see also id.* at 1359 (finding Paragraph 1491(b)(1) imposes more "stringent" requirements than Article III). The court of appeals then held that Weeks Marine had alleged a non-trivial competitive injury on the basis of the government's decision to stop using sealed bids for regular contracts and instead use negotiated IDIQ contracts: "Under the IDIQ task order solicitation, however, Weeks would only be guaranteed a minimum of $2,500 and [the government] could deny Weeks all task orders for the next five years without any explanation or discussions, or any ability for Weeks to seek bid

protest review.  This non-trivial competitive injury is capable of being redressed by this [c]ourt." *Id.* at 1362.

        After the decision in *Weeks Marine*, the Federal Circuit and this court have declined to inexorably apply the "substantial chance" test when analyzing economic interest.  Rather, the courts ask whether the context of a case presents a "factual foundation" for a "substantial chance" analysis.  For example, the court of appeals in *Systems Application* explicitly reaffirmed this principle, holding that "[a] protest will, by its nature, dictate the necessary factors for a 'direct economic interest.'"  *Systems Application*, 691 F.3d at 1382 (citing *Weeks Marine*, 575 F.3d at 1361-62).  The court found that the case was factually akin to a pre-award protest and consequently applied the "non-trivial competitive injury" test, finding plaintiff would suffer such an injury if it was forced to recompete for a contract it had already won.  *Id.* at 1382-83.

        This principle was further affirmed in *Orion Technology*, 704 F.3d at 1349.  In that case, a plaintiff's bid was disqualified prior to award because it failed to include proprietary cost information, as required by the RFP.  *Id.* at 1346-47.  Citing *Weeks Marine*, the Federal Circuit analyzed whether there was a "sufficient factual predicate" for the substantial chance test.  *Id.* at 1348-49 (citing *Weeks Marine*, 575 F.3d at 1361).  "Given the circumstances," which included the fact that plaintiff had drafted a bid, the Federal Circuit found that "there is an adequate factual predicate to ascertain under the traditional 'substantial chance' standard whether Orion was prejudiced by the [government's] decision to exclude its initial proposal."  *Id.* at 1349.

        The defendants argue that *Weeks Marine*, *Systems Application*, and *Orion Technology* are distinguishable because they are, or are similar to, "pre-award" protests, meaning that the protestors in these cases challenged government action prior to the announcement of a winner.  Def.'s Suppl. Br. at 5, ECF No. 26; Def.-Interv.'s Suppl. Br. at 4, ECF No. 27.  Although the facts of *Weeks Marine* were pre-award, the holding is not so limited.  The operative language said "there is no factual foundation for a 'but for' prejudice analysis."  *Weeks Marine*, 575 F.3d at 1361.  Nor did *Systems Application* limit its holding to pre-award cases.  Instead, the *Systems Application* court stated broadly that: "[a] protest will, by its nature, dictate the necessary factors for a 'direct economic interest.'"  *Systems Application*, 691 F.3d at 1382.  It did not say that is true "only" in pre-award protests.  *Id.*  In any event, *Systems Application* was not a typical "pre-award" case, because the protestor was a contract awardee.  Nor did *Orion Technology* limit its holding to pre-award cases.  There, the court said that the substantial chance test "generally" governed.  *Orion Technology*, 704 F.3d at 1348.  The court then stated that "an exception" – not *the* exception – is "when a prospective bidder challenges the terms of the solicitation itself, prior to actually submitting a bid."  *Id.*

        Moreover, decisions by this court have applied *Weeks Marine*'s economic interest test outside the pre-award context.  For example, in *Navarro*, the plaintiff bid for a contract but lost to another bidder.  94 Fed. Cl. at 226.  Although procurement statutes allegedly required the agency to debrief the plaintiff, the agency refused to provide a debriefing, so Navarro filed suit.  *Id.* at 227. In response, the government moved to dismiss for lack of standing.  *Id.* at 228.  The court's opinion explained that "Navarro is not challenging the procurement decision itself but rather seeks to enforce a post-award procedural remedy – an allegedly mandatory debriefing.  In other words, even if Navarro were to prevail here, it would not be awarded the contract."  *Id.* at

229.  Because Navarro could not be awarded a contract, the government argued that Navarro had
"no direct economic interest."  *Id.*  But the *Navarro* court disagreed.  That Navarro would not be
awarded the contract if it prevailed in its suit did not mean Navarro was disinterested.   Instead,
the factual predicate made the "substantial chance" test inapposite, leading *Navarro* to apply the
*Weeks Marine* test for standing.  *Id.* at 229-30.

    Many protestors do not ultimately seek the award of a contract, but they wish instead to
vindicate some other economic interest within this court's jurisdiction.  That is true especially for
protests that are pre-award or "in connection with a procurement."  For instance, in *RAMCOR*,
185 F.3d at 1288-89, the protestor could have at most won an injunction requiring the agency to
comply with the automatic stay provided by the Competition in Contracting Act; it would not be
in line for contract award as a result of its suit.  Similarly, a contract awardee in a multiple-award
IDIQ pool has an economic interest in stopping the government from stepping outside stated
procurement terms in making further awards.  *See Magnum Opus Techs., Inc. v. United States*,
94 Fed. Cl. 512, 530 (2010) (protesting the Air Force's non-competitive exercise of options for
only four of six holders of IDIQ contracts and contending that the Air Force was required to hold
a new competition for the work at issue), *mot. to amend denied*, 94 Fed. Cl. 553.  In the same
vein, a contract awardee has an economic interest in protesting the government's action to in-
source work, rather than exercising options on the awardee's contract.  *Elmendorf Support Servs.
J.V. v. United States*, 105 Fed. Cl. 203, 208 (2012) (concluding that a challenge to an in-sourcing
action was "in connection with a procurement").  And, as in *Systems Application*, an awardee
may have an economic interest in halting agency corrective action.  *Wildflower Int'l., Ltd. v.
United States*, 105 Fed. Cl. 362, 383-85 (2012) (pre-award, or "in connection with").

    The court is unpersuaded by the defendants' arguments based upon *Automation Techs.,
Inc. v. United States*, 73 Fed. Cl. 617, 625 (2006), and *ABF Freight System, Inc. v. United States*,
55 Fed. Cl. 392, 397 (2003).  The defendants assert that *Automation* shows that an IDIQ contract
holder cannot challenge an award to another IDIQ contract holder under the same solicitation.
Def.'s Mot. at 5; Def.-Interv.'s Resp. at 4.  In that case, the solicitation stated that the
government sought to award one single-award IDIQ contract for computer services.  *Automation*,
73 Fed. Cl. at 621 (finding that the contracting officer contemplated a single contract).  The
contract gave the holder a right to receive a minimum task order of $2,500 and maximum task
orders worth millions of dollars.  *Id.* at 623.  The government awarded a single IDIQ contract to
the protestor.   A losing offeror then protested to GAO, which prompted the agency to take
corrective action in which it elected to make a second IDIQ award, this time to the losing offeror.
*Id.*  The original winner then filed a protest in this court.  The protestor in *Automation* did not
argue that the government had illegally added a contractor to a multiple-award task order pool;
the protestor instead argued that the government's corrective action had, in effect, revoked its
award and made a new award to the losing offeror.  *Id.* at 619.  On these facts, the court in
*Automation* first appeared to address the merits, stating that there was no "statutory or regulatory
prohibition from making multiple ID/IQ contracts."  *Id.* at 623.  Next, the court held that the
plaintiff lacked standing because even if it won, it was not guaranteed task orders beyond the
$2,500 minimum obligation in its contract.  *Id.* at 624.

    The decision in *Automation* is unavailing for three reasons.  First, that case was decided
in 2006, prior to the Federal Circuit's decision in *Weeks Marine*.  The court in *Automation*

believed it had to apply the "substantial chance" test. *Automation*, 73 Fed. Cl. at 621. Now, however, Federal Circuit precedent shows that the "substantial chance" test does not apply to every bid protest. *Weeks Marine*, 575 F.3d at 1361. Second, the plaintiff in *Automation* did not allege an illegal increase in the task order pool, but instead asserted that the government's decision to award a contract to its opponent had the effect of revoking the original award to the protestor. *Automation*, 73 Fed. Cl. at 619 ("[Protestor] responds that the agency's award of a contract to [the other contractor] effectively eliminates any chance of [its] receiving further delivery orders under its contract.").[9] Here, National alleges the government illegally increased the size of the IDIQ pool without applying the recompetition provisions of the RFP, causing competitive harm. Third, *Automation* may not be a jurisdictional decision, because it appears to decide the merits of the case by concluding that the statutes did not bar the government's action, *id.* at 623, rather than focusing first on jurisdiction and standing, *see Engage Learning*, 660 F.3d at 1355.

For similar reasons, the court is not convinced by the government's citation to *ABF Freight*, 55 Fed. Cl. at 397. In that case, decided in 2003, essentially all of the bidders on a contract – awardees and losers – challenged the government's changes to the language of the solicitation, which changes occurred prior to the announcement of awards. *Id.* There, the defendant did not raise the issue of the awardees' standing to protest, yet the court *sua sponte* found that the awardees lacked standing to challenge the language of the solicitation post-award. *Id.* Although the court in *ABF Freight* stated its conclusion in terms of standing, its reasoning is more akin to the waiver analysis in *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1315-16 (Fed. Cir. 2007), which held four years later that a plaintiff must object to patent errors in a solicitation prior to the close of the bidding process. *See, e.g.*, *Pacific Helicopter Tours, Inc. v. United States*, No. 06-613, 2007 WL 5171114, at *13 (Fed. Cl. Jan. 12, 2007) (citing *ABF Freight* as a case analogous to *Blue & Gold Fleet*). When *ABF Freight* was decided in 2003, the Federal Circuit had not yet addressed this waiver issue, and the *ABF Freight* court's primary concern appears to have been addressing plaintiff's tardy objections to the revised language of the solicitation, which the court styled as a matter of standing. Thus *ABF Freight* is not instructive.

In summary, this court will follow the precepts applied in *Weeks Marine* and *Systems Application*. Like *Weeks Marine*, the facts of National's case provide no "factual foundation" for a "substantial chance" analysis, because National does not seek a contractual award but instead seeks to remedy an alleged violation of procurement law that has affected the task order pool. *See Navarro*, 94 Fed. Cl. at 230. Accordingly, the court will analyze National's complaint to determine whether it demonstrates a "non-trivial competitive injury which can be redressed by judicial relief." *Weeks Marine*, 575 F.3d at 1362.

Turning to the factual context of this case, National is an "actual" bidder because, as a matter of fact, it bid on this IDIQ solicitation. As discussed *supra*, National's status as a contract

---

[9]Notably, the contracts in *Automation* did not include a clause providing procedures for competing task orders. *See Digital Techs., Inc. v. United States*, 89 Fed. Cl. 711, 714 (2009) (recounting facts of *Automation* in a subsequent breach-of-contract action by one of the parties to a contract).

awardee does not by itself deprive this court of bid protest jurisdiction.  *See Systems Application*, 691 F.3d at 1381-82 (concluding that a proper protest was not subject to CDA).

National also has a direct economic interest, because it has shown a "non-trivial competitive injury which can be redressed by judicial relief." *Weeks Marine*, 575 F.3d at 1362. National alleges that the RFP imposed conditions on reopening the competition and that TRANSCOM violated these RFP provisions.  Because the court is considering a motion under RCFC 12(b)(1), it must initially decide only the jurisdictional issue, not the merits.  *See Engage Learning*, 660 F.3d at 1355.  If plaintiff is correct, the competition for roughly $296 million of task orders available to the IDIQ pool will be affected to National's detriment.  Plaintiff's complaint avers that it seeks more than just $2,500; it seeks to compete for roughly $296 million in task orders. Compl. ¶¶ 32-33.  And because of the government's allegedly illegal conduct in adding further awardees, that competition will be "significant[ly]" increased, as the parties agree. *See* Def.'s Opp'n at 9 (United will be "a significant source of competition at the task order level"); Compl. ¶¶ 32-33.  That is a non-trivial competitive injury, prejudicial to National.  *See, e.g.*, *Canadian Lumber Trade Alliance v. United States*, 517 F.3d 1319, 1332-33 (Fed. Cir. 2008) (holding increased competition is an injury-in-fact under Article III, and discussing the doctrine of "competitor standing" in the international trade context); *BayFirst Solutions, LLC v. United States*, 104 Fed. Cl. 493, 501 (2012) (loss of competitive advantage is non-trivial competitive injury under *Weeks Marine*); *URS Fed. Servs.*, 102 Fed. Cl. at 669 (same).

Despite this, the government has argued, and GAO agrees, that a multiple-award IDIQ contract holder has no interest in the size of the IDIQ task order pool because that holder has only a right to some nominal minimum amount (in this case, $2,500) of task orders.  Def.'s Mot. at 4;  Second GAO Decision at 4.  That view is not realistic because potential contractors bid on IDIQ contracts to compete for task orders, which can amount to much more than the minimum. *See, e.g.*, *Serco Inc. v. United States*, 81 Fed. Cl. 463, 466 (2008) (considering an IDIQ solicitation for up to $50 billion in task orders over five years, with a minimum guarantee of $2,500 for each awardee).  The $2,500 task order minimum is only a "peppercorn" – a nominal amount to satisfy the contract law doctrine of consideration.  *See, e.g.*, *Coyle's Pest Control, Inc. v. Cuomo*, 154 F.3d 1302, 1304 (Fed. Cir. 1998) ("The contract at issue in this appeal . . . does not contain the necessary elements of an enforceable indefinite quantity contract, nor an enforceable requirements contract.  The enforcement of such a contract would fail for lack of consideration in the absence of a clause stating a minimum quantity.") (quoting and affirming a decision by a board of contract appeals).  The minimum satisfies the law of consideration, but it does not mean that IDIQ contractors lack a "direct economic interest" in the competition for task orders.[10]  In sum, National has "a definite economic stake in the solicitation being carried out in accordance with applicable laws and regulations." *Weeks Marine*, 575 F.3d at 1362.

That National is an "interested party" within the meaning of Paragraph 1491(b)(1) is supported by the case of *Glenn Defense Marine (ASIA) PTE, Ltd. v. United States*, in which a

---

[10]Subsection 2304c(e) of Title 10 prohibits protests "in connection with the issuance" of a "task or delivery order" for agencies subject to Title 10, except for orders valued in excess of $10 million, as to which GAO has exclusive jurisdiction. This statute is not relevant, because National's protest is not in connection with a task order.

protestor that won an IDIQ contract had standing to challenge the government's award of another IDIQ contract under the same solicitation to different offeror.  97 Fed. Cl. 311, 317 n.3 (2011), *appeal on other grounds dismissed as moot after government settled with plaintiff*, 469 Fed. Appx. 865 (2012).  *Glenn Defense* devoted only a footnote to standing as an interested party, yet its factual similarity makes the case instructive here.  In *Glenn Defense*, the government originally intended to procure one IDIQ contract for four ports in the Philippines, but then awarded two IDIQ contracts, each covering two ports.  *Id.* at 311-17.  Glenn Defense received one of these IDIQ contracts, yet it protested the second award arguing that the solicitation required one IDIQ contract award covering all four ports.  The court concluded Glenn Defense had standing.  *Id.* at 317 n.3.  One might argue that *Glenn Defense* is like a traditional post-award protest by a losing offeror, because the protestor's one IDIQ contract covered only two of the four ports and the protestor filed suit seeking to have the other two ports included in its one IDIQ contract.  *Id.* at 323 (noting that defendant said during litigation that it "did not intend more than one contractor to compete for task orders under any given IDIQ contract").  And, in *Glenn Defense* the court concluded without analysis that the "central nature of the allegation of error" was sufficient to meet the "preliminary 'standing' threshold."  *Id.* at 317 n.3.  The facts of the case, nonetheless, suggested that Navy ships in the Philippines could dock at any of the four ports, meaning that for practical purposes this was a multiple-award IDIQ contract in which the parties would compete for ship traffic.  *Id.* at 314 (noting that ports had to have the capacity to husband up to eight ships at a given time).  The court's decision even noted that, based on extrinsic evidence, the government may have considered that procurement to be a multiple-award IDIQ procurement in which Glenn Defense would actually compete for task orders.  *See id.* at 322 (noting that the government responded to bidder's questions by reserving the right to make multiple awards pursuant to FAR § 16.504(c)(1), and only during litigation did it disclaim any intent that more than one contractor might compete for task orders).  Under either view, the case is instructive because the protestor had won an IDIQ contract, yet it had standing to challenge an award under the same solicitation to another IDIQ awardee, on the theory that the solicitation limited the number of possible IDIQ awardees.[11]

---

[11]Notably, on appeal the government conceded and gave Glenn Defense one IDIQ contract for *all* of the ports.  *Glenn Def. Marine (ASIA) PTE, Ltd. v. United States*, 469 Fed. Appx. 865, 866 (Fed. Cir. 2012).  Thus its protest was moot.  Nonetheless, Glenn Defense did not drop its appeal, arguing its case was not moot because the government's illegal excess award was capable of repetition, yet evading review.  The Federal Circuit rejected that argument, concluding the claims were moot and would not evade review in the future: "[e]ven if the Navy is likely to continue to use solicitations for multiple-lot contracts . . . and Glenn Defense is likely to continue to bid on them, we do not see why the refusal to award a single [IDIQ] contract rather than a split award [IDIQ] contract is the sort of action that is likely forever to 'evade review.'"  *Id.* at 867 (quoting *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 481 (1990) for the law of Article III mootness)).  The Federal Circuit's comment, which considers Article III standing elements similar to those pertinent to Paragraph 1491(b)(1), implicitly approves of a protestor having standing to challenge the government's decision to award more IDIQ contracts than contemplated by a solicitation.

In short, National has alleged violations of procurement law and regulations that bring its protest within the ambit of Paragraph 1491(b)(1), and its allegations of harm suffice to establish its standing to sue.

## NATIONAL'S MOTION FOR PRELIMINARY EQUITABLE RELIEF

### A. *Standard for Decision under RCFC 65*

This court "may issue" a preliminary injunction or temporary restraining order on motion or application of a party.  RCFC 65(a)(1), (b)(1).  The party seeking preliminary injunctive relief must establish that (1) it is likely to succeed on the merits; (2) it will suffer irreparable harm if the injunction is not granted; (3) the balance of hardships tips in its favor; and (4) that a preliminary injunction will not be contrary to the public interest.  *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993).  No single factor is dispositive, but "a protestor must establish the first two factors, likelihood of success on the merits and irreparable harm, before a preliminary injunction can be granted."  *Lockheed Martin Corp. v. United States*, 124 Fed. Cl. 709, 721 (2016) (citing *Per Aarsleff A/S v. United States*, 123 Fed. Cl. 147, 156-57 (2015) (in turn citing *Altana Pharma AG v. Teva Pharm. USA, Inc.*, 566 F.3d 999, 1005 (Fed. Cir. 2009))).

### B. *Whether National Is Likely to Succeed on the Merits*

This court reviews agency procurement decisions "pursuant to the standards set forth in section 706 of title 5 [the Administrative Procedure Act]."  28 U.S.C. § 1491(b)(4).  The cited section "provides, in relevant part, that a 'reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (quoting 5 U.S.C. § 706)).  Accordingly, the court may set aside a procurement action under Paragraph 1491(b)(4) if "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure."  *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001).  Of particular relevance to this case, "[i]t is hornbook law that agencies must evaluate proposals and make awards based on the criteria stated in the solicitation."  *Banknote Corp. of Am., Inc. v. United States*, 56 Fed. Cl. 377, 386 (2003).  Interpretation of a solicitation is a question of law.  *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1353 (Fed. Cir. 2004).  "If the provisions of the solicitation are clear and unambiguous, they must be given their plain and ordinary meaning."  *Id.* (citing *Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1038 (Fed. Cir. 2003) (*en banc*)).

National first argues that the RFP's reopening provisions barred the government from making any awards after the government's initial award of five contracts on June 11, 2015.  Compl. ¶ 60.  Those provisions said that the government could "reopen" the competition to add contractors to the IDIQ pool if there was a "shortfall in meeting the requirements among the existing" pool of awardees or if the government found that "it is in the [g]overnment's best interest to add new contractors to the original pool of IDIQ contract holders."  Compl. ¶ 44 (citing RFP at 52).  National considers that the "original pool" of contractors was determined on June 11, 2015 when the government awarded five contracts.  For the government to make an

award after that time, National contends that TRANSCOM needed to test whether it could meet its shipping needs by placing orders subject to competition among the awardees and then comply with the reopening provisions if it found its needs could not be met.

National's argument comports with a reasonable interpretation of the language of the solicitation, which specifically provides that "the [g]overnment will compete [the] requirements amongst all existing IDIQ contract holders to determine if the contract holders can adequately fulfill the needed capacity." RFP at 52. Reopening would arguably occur only after the contract holders were unable to meet capacity ("if there is [a] shortfall in meeting the requirements") or where "it is in the [g]overnment's best interest to add new contractors to the original pool of IDIQ contract holders." *Id.* Then, the addition of new contractors would follow posting in "FedBizOps [to] allow[] new . . . offerors the opportunity to compete in a full and open competition." *Id.* Because the solicitation included provisions for "reopening" the IDIQ solicitation to add contractors to the "original pool," it implies that the solicitation must first close and thereby create an "original pool." And because the government awarded five contracts on June 11, 2015, one might say these five contractors constituted the "original pool." Despite this implication, the solicitation is ambiguous and makes no express delination on when the members of the "original pool" are selected.

That ambiguity is likely resolved by examining the provisions regarding acceptance of offers. As a general rule, an offeror may define when his or her offer can be accepted. *International Tel. & Tel., ITT Defense Commc'ns Div. v. United States*, 453 F.2d 1283, 1290-91 (Ct. Cl. 1972) ("The offeror's limitation of the time is not operative if it is not communicated to the offeree . . . but if so communicated it operates with certainty."); *see also Restatement (Contracts) Second*, § 41(1) (1981) ("An offeree's power of acceptance is terminated at the time specified in the offer, or, if no time is specified, at the end of a reasonable time."). Here, the solicitation required offerors to hold offers open for 180 days after submission on March 16, 2015. RFP at 86. It thus contemplated acceptance by TRANSCOM at any point during that time. Because the government had the power to accept offers on this solicitation for 180 days, by implication the "original pool" would not close until that time expired. Only after those 180 days, when the government could no longer accept offers, did the "reopening" provisions come into effect. Turning to the facts of this case, the 180-day period began to run on March 16, 2015. RFP at 2. Although the government initially awarded five contracts on June 11, 2015, its decision to award a sixth contract to United on July 17, 2015 was still within the 180-day period. On this reading, the reopening provisions of the RFP were not yet in effect, meaning the government did not violate them by making an award on July 17, 2015. The government thus has a reasonable argument that the reopening provisions of the RFP were not triggered.

National next argues that the United States violated the solicitation by awarding six IDIQ contracts. Compl. ¶¶ 40-42. The relevant solicitation language provides: "[t]he [g]overnment intends to award approximately four (4) IDIQ contracts resulting from this solicitation to provide [g]overnment shippers flexibility of choice and service coverage." RFP at 87. In this context, the word "approximately" generally means "nearly exact" or nearly "accurate." *Webster's II New College Dictionary* 56 (2001). It does not mean "precisely" or "exactly." The phrase "approximately four" therefore permits the government to award more than four contracts. National appears to concede this point, because it does not challenge the fifth contract award.

Instead, it challenges only the sixth award, which went to United. The question then is whether "approximately four" means "not more than five." Plaintiff cites no authority – no definitions in the solicitation or regulations – to explain why "approximately four" should have such meaning. The court accordingly is not convinced that an award of six contracts is not an award of "approximately" four contracts.

National's final argument is that United lacks the requisite past performance history. Compl. ¶ 62. National concedes that it lacks evidence supporting this contention because it does not yet have access to the administrative record. Pl.'s Mot. at 4. The court understands National's predicament, but National still has the burden of providing some evidence, even if only affidavits from National's employees or others based on their personal knowledge, in support of its contention. Without more the court cannot evaluate the merits of this claim. Moreover, even if National is correct that United lacks past performance history, then at worst it would have received an "unknown confidence" rating, which would be "treated neither favorably nor unfavorably." RFP at 89.

For these reasons, National has not established that it is likely to succeed on the merits of its protest, and the court cannot issue a preliminary injunction or a temporary restraining order. *See Lockheed*, 124 Fed. Cl. at 721 (declining to preliminarily enjoin contract award when protestor did not establish a likelihood of success or irreparable harm) (citing *Altana Pharma*, 566 F.3d at 1005). It is unnecessary to address the remaining factors for injunctive relief.

## CONCLUSION

The United States' motion to dismiss is DENIED. National's motion for a preliminary injunction and its application and supplemental application for a temporary restraining order are also DENIED. On or before May 10, 2016, the parties shall submit a Joint Status Report regarding further proceedings in this matter.

It is so **ORDERED**.

s/ Charles F. Lettow
Charles F. Lettow
Judge