# In the United States Court of Federal Claims

No. 16-362C

(Filed Under Seal:  August 19, 2016)

(Reissued:  August 26, 2016)

|  |  |  |
|---|---|---|
| NATIONAL AIR CARGO GROUP, INC., | ) ) ) | Post-award bid protest following corrective action; challenge by a successful offeror to addition of another awardee to an IDIQ contract; jurisdiction; standing; "firm offer" rule; "best value" determination |
| Plaintiff, | ) ) ) | |
| v. | ) ) | |
| UNITED STATES, | ) ) | |
| Defendant, and | ) ) ) | |
| UNITED AIR LINES, INC., | ) ) ) | |
| Defendant-Intervenor. | ) ) ) | |

Milton C. Johns, Fluet, Huber + Hoang, PLLC, Woodbridge, Virginia, for plaintiff.

Aaron E. Woodward, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C. for defendant.  With him at the hearing and on the briefs was Major George M. Ebert, Trial Attorney, Commercial Litigation Field Support Center, United States Air Force, Andrews Air Force Base, Maryland.  Also with him on the briefs were Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Civil Division, Robert E. Kirschman, Jr., Director, and Douglas Mickle, Assistant Director, Civil Division, United States Department of Justice, Washington, D.C.  Of counsel were Karen L. Tibbals and Peter B. Ries, Acquisition Attorneys, United States Transportation Command, Scott Air Force Base, Illinois.

David S. Cohen, Cohen Mohr, LLP, Washington, D.C. for defendant-intervenor.  With him on the briefs were John J. O'Brien and Daniel J. Strouse, Cohen Mohr, LLP, Washington, D.C.

## OPINION AND ORDER[1]

---

[1]Because this opinion and order might have contained confidential or proprietary information within the meaning of Rule 26(c)(1)(G) of the Rules of the Court of Federal Claims

LETTOW, Judge.

In this bid protest, National Air Cargo Group, Inc. ("National") alleges a violation of statutes and regulations "in connection with a procurement" conducted by the United States Transportation Command ("TRANSCOM" or "government").  28 U.S.C. § 1491(b)(1). TRANSCOM awarded five indefinite-delivery/indefinite-quantity contracts on June 11, 2015 for multi-modal international shipping of government cargo.  National was one of the awardees. That same day, TRANSCOM notified another offeror, United Air Lines, Inc. ("United"), that it would not receive an award.  United then filed an agency-level bid protest, which ultimately led the agency to award a contract to United, bringing the total number of contracts awarded to six. In response, National submitted protests regarding United's award, first to the Government Accountability Office ("GAO") and then to this court, arguing that this sixth award violated language in the solicitation that limited the number of awardees and required recompetition before awarding further contracts beyond the original awardees.  National also alleged that United lacked relevant past performance.  National's protests resulted in TRANSCOM's agreement to take corrective action to reevaluate past performance for all six TRANSCOM offerors.  Subsequently, TRANSCOM reaffirmed the awards made to each of the six successful offerors.  That action prompted this renewed protest.  The matter is now before the court on cross-motions for judgment on the administrative record.  A hearing was held on July 27, 2016. For the following reasons, National's motion for judgment is DENIED, the government's and United's motions are GRANTED.

## FACTS AND BACKGROUND[2]

*A. TRANSCOM Identifies a Need for an Indefinite-Quantity Contract for International Shipping Services, to be Awarded to "Approximately Four" Contractors*

TRANSCOM determined in 2014 that it needed international shipping services to move government cargo to and from Afghanistan.  AR 1-6.[3]  Owing to the government's drawing

---

("RCFC") and the protective order entered in this case, it was initially filed under seal.  The parties were requested to review this opinion and file proposed redactions with the court.  No redactions were requested.

[2]The recitations that follow constitute findings of fact by the court drawn from the administrative record of the procurement filed pursuant to RCFC 52.1(a), *see Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005) (specifying that bid protest proceedings "provide for trial on a paper record, allowing fact-finding by the trial court"), as well as from the parties' evidentiary submissions related to prejudice and equitable relief, *see Holloway & Co. v. United States*, 87 Fed. Cl. 381, 391 n.12 (2009) ("It is the responsibility of th[e] court, not the administrative agency [conducting the procurement], to provide for factual proceedings directed toward, and to find facts relevant to, irreparability of harms or prejudice to any party or to the public interest through grant or denial of injunctive [or declaratory] relief.") (quoting *PGBA, LLC v. United States*, 60 Fed. Cl. 567, 568 n.1 (2004), *aff'd*, 389 F.3d 1219 (Fed. Cir. 2004)).

[3]Citations to the administrative record refer to the record as certified by TRANSCOM and filed with the court pursuant to RCFC 52.1(a).  The record is paginated sequentially and is

down of military operations in that country, TRANSCOM contemplated a contract with a base period of one year, followed by two one-year option periods. AR 1-6 to -7. TRANSCOM proposed using an indefinite-quantity contracting vehicle for this procurement. AR 12-305 (citing 48 C.F.R. ("Federal Acquisition Regulations" or "FAR") § 16.504(c)). An "indefinite-quantity" contract, also known as an indefinite-delivery/indefinite-quantity ("IDIQ") contract, is a contract by which the government promises to buy a stated minimum and the contractor agrees to sell or provide a stated maximum. FAR § 16.504(a)(1); *see also* John Cibinic, Jr., et al., *Formation of Government Contracts* 1386 (4th ed. 2011). Once an IDIQ contract is awarded, the government issues task or delivery orders to one or more of the IDIQ contract holders to fulfill its requirements. In some instances, the government awards one IDIQ contract to one contractor, but in most cases the government awards multiple IDIQ contracts under one solicitation, thereby creating a pool of contractors who compete with each other for task orders. *See, e.g.*, FAR § 16.504(c)(1)(i) (requiring the contracting officer to "give preference" to making multiple awards); FAR § 16.505(b)(1)(i) (providing that each awardee under a multiple-award contract must have an opportunity to compete for any order exceeding $3,500).

TRANSCOM planned to award "approximately four" IDIQ contracts. AR 12-305. To justify that number of awards, a contracting official wrote a memorandum-to-file explaining that

> logistical/operational constraints in the [United States Central Command ("CENTCOM") area of Responsibility] are a significant consideration in determining the efficient number of contract awards. Due to airfield limitations at the CENTCOM aerial ports (which are worsening as the drawdown continues), frequent Prior Permission Requests (PPR) denials have resulted in cargo delays. Limiting the number of prime contractors to approximately four will provide relief for this PPR problem as there will be fewer carriers submitting requests.

AR 12-305.[4]

## B. TRANSCOM Issues a Request for Proposals

On February 12, 2015, the government issued a request for proposals ("RFP"). AR 14-321 to -520.[5] The RFP established four factors that the government would consider in making its

---

also divided into tabs. In citing to the record, the court will first designate the tab, followed by the page numbers, *e.g.*, AR 1-6 refers to page 6 which is located in Tab 1 of the record.

[4]CENTCOM is a unified military command responsible for the Middle East and Afghanistan.

The record does not show when the government determined to make "approximately four" awards. However, on December 17, 2014, a contract specialist with TRANSCOM wrote a memorandum-to-file regarding one-on-one meetings between TRANSCOM and prospective offerors during an "industry engagement day" at Scott Air Force Base on December 9, 2014. AR 9-235; *see also* AR 8-233 (showing registration instructions for the "industry engagement day"). In the specialist's memorandum, she noted that one prospective offeror asked "how many awards do you intend to make?" AR 9-238. The "government response" was "approximately 4." *Id.*

[5]Solicitation number HTC711-15-R-R001.

awards: quality of business proposal, technical ability, price, and past performance history. AR 14-407 to -09. As an initial matter, the government would determine whether an offeror's business and technical proposals were "acceptable." AR 14-407. If so, the government would then "make an integrated assessment" of the price and past performance factors to determine which bidder offered the "best value" to the government. *Id.* Past performance and price would be given "equal" weight in that evaluation. *Id.* With respect to past performance, the government would give each offeror a "confidence assessment" of either substantial confidence, satisfactory confidence, limited confidence, or no confidence. AR 14-408 to -09. If an offeror had "no recent/relevant performance" of record, then the offeror would receive an "unknown confidence" rating, which would be "treated neither favorably nor unfavorably." AR 14-409.

The RFP further provided that "[t]his is an indefinite-quantity contract for the supplies or services specified, and effective for the period stated." AR 14-329. "The [g]overnment intends to award approximately four (4) IDIQ contracts resulting from this solicitation to provide [g]overnment shippers flexibility of choice and service coverage." AR 14-407. Pursuant to FAR § 16.504(a)(1), which requires a minimum task order for each winner, the RFP guaranteed that the government would purchase a minimum of $2,500 of international shipping services from each awardee. AR 14-324. The solicitation set the maximum total dollar amount for all task orders over three years at $296,448,852.21. *Id.* In essence, each winner thus would compete for up to $296 million in task orders.

Offers were due on March 16, 2015. AR 14-321. In the RFP, TRANSCOM asked each offeror to "agree[] to hold the prices in its offer firm for 180 calendar days from the date specified for receipt of offers." AR 14-406 (quoting FAR § 52.212-1(c), but replacing "30" in that regulation with "180"). Pursuant to FAR § 52.212-2(c), the RFP further specified that

> [a] written notice of award or acceptance of an offer, mailed or otherwise furnished to the successful offeror within the time for acceptance specified in the offer, shall result in a binding contract without further action by either party. *Before the offer's specified expiration time, the [g]overnment may accept an offer (or part of an offer), whether or not there are negotiations after its receipt, unless a written notice of withdrawal is received before award.*

AR 14-410 (emphasis added). The RFP also provided that, in certain circumstances, the government could "reopen" the competition to add contractors to the pool:

## 1. Recompetition

1.1 The Government will initially establish the awardee pool by competitively awarding multiple-award IDIQ contracts. *As future task order requirements within the program ceiling totals materialize, over the life cycle of this program, the Government will compete those requirements amongst all existing IDIQ contract holders to determine if the contract holders can adequately fulfill the needed capability. The Government reserves the right to reopen the competition*

> *under this solicitation if there is [a] shortfall in meeting the requirements among the existing IDIQ contract holders or if it is in the Government's best interest to add new contractors to the original pool of IDIQ contract holders.* When/if the Government decides to reopen the solicitation, an announcement will be posted via FedBizOps allowing new . . . offerors the opportunity to compete in a full and open competition for an IDIQ contract and task orders to meet the new requirements. Any existing IDIQ contract holder will not re-compete for an IDIQ contract. The competitions will use the same evaluation methodology and documentation (updated to reflect changes in regulatory provisions, requirements and certifications) as the original competition.

AR 14-372 (emphasis added). After adding new contractors to the IDIQ pool, the government would continue soliciting task orders from the expanded pool: "Once a new awardee(s) is selected, that awardee(s) will be included in the awardee pool and will compete for future task orders. Subsequent to a reopened competition, initial and new IDIQ awardees can compete for future task orders." *Id*.

In response to the RFP, National submitted a proposal, AR 24-792, as did United, AR 26-961, along with five other offerors, for a total of seven offers. One offeror was subsequently determined to be ineligible for award. *See* AR 107-2877. On June 5, 2015, the Source Selection Authority ("SSA") evaluated the offers. She concluded that, in terms of price, United had the lowest total evaluated price at $75.9 million; National had the second-lowest price at $88.7 million; and the remaining offerors had higher prices, ranging from $91.3 million to $131.2 million. AR 71-1769. Turning to past performance, the SSA concluded that United had the lowest past performance rating of the six offerors. *Id*. In the government's view, United's past performance quality was either "very good" or "exceptional" in terms of work performed, but that work was largely not relevant to the worked specified in the solicitation. AR 67-1697. For that reason, United was given a "limited confidence" assessment. In contrast, the remaining offerors all received ratings of either "satisfactory confidence" or "substantial confidence." AR 71-1769. Because United had the lowest past performance rating, the SSA determined that "the [g]overnment has a low expectation the offeror will successfully perform the required effort, [and] therefore, [] United's lower price is not advantageous to the [g]overnment considering the risk the offeror will be unable to perform this effort." AR 71-1773. The SSA thus elected to award contracts to the other five offerors, but not United. AR 71-1774. The SSA's decision acknowledged that the solicitation specified "approximately four" awards, and on that point, the SSA wrote that "I have determined awarding five contracts is appropriate because five offerors represent the best value to the [g]overnment." *Id*. She stated that

> awarding five contracts ensures competition at the task order level as each requirement is competed among the IDIQ contract holders and is consistent with the terms of the solicitation. Additionally, the solicitation allows for global expansion beyond the current countries of the United States, Afghanistan, United Arab Emirates, and Kuwait, therefore, five contracts provide the [g]overnment flexibility to meet unforeseen D[epartment ]o[f ]D[efense] requirements.

*Id*.

TRANSCOM announced awards to National and the four other bidders on June 11, 2015. AR 76-2071; *see also* AR 72, 73, 74, 75 (showing acceptance letters by TRANSCOM to the winning offerors). Concurrently, TRANSCOM informed United that it would not be awarded a contract, owing to United's "[p]ast [p]erformance confidence assessment rating." AR 77-2175 to -76. On June 16, 2015, TRANSCOM debriefed United, explaining it had lost because "United's [l]imited [c]onfidence is considered to be disproportionate to the benefits associated with their lower [price]." AR 86-2314. United responded on June 26, 2015 by filing an agency-level bid protest, arguing that TRANSCOM had failed to justify its conclusion that United did not offer the best value to the government, given that United was the lowest-priced offeror and, in United's view, had a past performance history that was not dissimilar from at least two of the awardees. AR 88-2319, -2327 to -38. On July 15, 2015, the contracting officer signed a memorandum-for-the-record finding United was a responsible contractor, AR 90-2365, and TRANSCOM then awarded an IDIQ contract to United, AR 91-2366; *see also* AR 92-2367 (showing parties' agreement to settle the agency-level bid protest).

### C. National Files Protests Challenging the Government's Award to United

National filed a bid protest with GAO on July 27, 2015, arguing that TRANSCOM's decision to award six contracts violated the RFP's limitations on awards. AR 94-2373 to -74. National argued that the five initial awardees constituted the "original pool" under the RFP, meaning that the government could not award any further contracts unless and until it complied with the RFP's reopening provisions. AR 94-2373. Because the government had not found a "shortfall in meeting its requirements" within the existing five-contractor IDIQ pool, National contended that the task order pool could not be reopened and expanded. AR 94-2373 to -74. National also argued that United lacked past performance history in multi-modal transportation, making the government's award decision irrational. AR 94-2374. On September 24, 2015, GAO summarily dismissed the protest, citing GAO policy: "we generally will not review a protest that has the purpose or effect of reducing competition to the benefit of the protester." AR 96-2507 to -08 (*National Air Cargo Grp., Inc.*, B-411830 (Comp. Gen. Sept. 24, 2015) ("First GAO Decision")). Accordingly, GAO would "not consider the merits of the protester's allegations, which, in essence, seek to limit the agency's discretion to increase the pool of competition among the IDIQ contract holders." First GAO Decision at 2.

National then filed a complaint in this court on October 13, 2015, alleging the same violations of procurement law as asserted in its GAO protest. Compl., *National Air Cargo Grp., Inc. v. United States*, No. 15-1191 (Fed. Cl. Oct. 13, 2015). Several days thereafter, the government informed the court that it would be "re-evaluating all offerors' past performance," "conducting limited discussions (if needed) with the offerors concerning their past performance," and "making a new award decision." Def.'s Notice of Corrective Action and Mot. to Stay Briefing at 1, *National Air Cargo Grp., Inc. v. United States*, No. 15-1191 (Fed. Cl. Oct. 19, 2015); *see also* AR 100-2809 (informing offerors that the government "will re-evaluate past performance for all offerors" and commenting that "[t]here will be no changes to price or technical proposals"). Owing to this corrective action, the court granted the government's unopposed motion to dismiss the complaint as moot. Order of Dismissal, *National Air Cargo Grp., Inc. v. United States*, No. 15-1191 (Fed. Cl. Nov. 30, 2015).

### D. *TRANSCOM Takes Corrective Action and Again Determines to Make Six Awards, Including Awards to National and United*

On January 15, 2016, the Source Selection Evaluation Board ("SSEB") re-evaluated the past performance of all offerors. AR 102-2818; *see also* Pl.'s Mot. for Judgment on the Administrative Record ("Pl.'s Mot.") at 8, ECF No. 45-1. Again, United was assigned a past performance rating of "limited confidence." AR 102-2831. The SSEB noted that United had submitted five past performance references, which generally rated United as either "exceptional" or "very good." *Id.* However, the SSEB found that only one of those references was for "relevant" shipping work. Of the remaining four references, two were "somewhat relevant" and two were "not relevant." *Id.* Although the SSEB could confirm that United had "some capability to transport cargo via air, land and sea," the references "do not clearly demonstrate whether or not the offeror could successfully perform international cargo transportation and distribution services via all three modes (air, land and sea) within a single contract at the magnitude and complexity of this effort." AR 102-2831 to -32.

On January 19, 2016, TRANSCOM's Source Selection Advisory Council ("SSAC"), headed by a new chairperson, performed a comparative analysis. AR 103-2845 to -54. The SSAC ranked the proposals, finding National was the second highest rated offeror. AR 103-2849. The SSAC next found that United was the third highest rated offeror because it was "rated technically acceptable, provided the lowest [total evaluated price] and received the third highest past performance confidence assessment rating of [l]imited [c]onfidence indicating the [g]overnment has a low expectation that this offeror will successfully perform the required effort." AR 103-2850. The SSAC found that "[t]his weighting was determined appropriate because performance risk is mitigated by competition at the task order level." *Id.* Although United's past performance received the lowest acceptable rating, and the worst rating among the offerors, the solicitation had also provided that price would be "equal" to past performance in the rating of offerors. *Id.* For that reason, "the risk in the area of performance is mitigated by the Ordering Procedures for task order award including in the contract, which considers performance metrics captured on a monthly basis." AR 103-2850 to -51. "Based on the above," the SSAC concluded that "the risk of awarding to United does not outweigh the potential benefits." AR 103-2581.

The SSAC then ranked the remaining offerors in places four through six. AR 103-2852 to -53. Surveying the offerors, the SSAC recommended six awards, including an award to United, finding that that number complied with the "approximately four" awards limitation. AR 103-2853. The SSAC specifically found that all six offerors had sufficient technical capability, and that the award of six contracts would generate lower prices through increased competition. *Id.* Six awards would also "provide the [g]overnment flexibility to meet unforeseen D[epartment ]o[f ]D[efense] requirements," which could increase owing to the fact that "the solicitation allows for global expansion beyond the current countries of the United States, Afghanistan, United Arab Emirates, and Kuwait." *Id.*

On January 21, 2016, the SSA again awarded contracts to all six offerors. AR 107-2877. Citing the SSAC report, the SSA ranked all six offerors according to best value, finding National was the second highest ranked offeror and that United was the third highest ranked offeror. AR

107-2879. Regarding United, the SSA agreed with the SSAC; although "there is some risk associated with United's performance history[,] . . . the risk to the [g]overnment in awarding to United is mitigated by the best value selection process at the task order level." *Id.*

*E. National Renews Its Protest of the Award to United*

National protested this decision at GAO on January 27, 2016, alleging the same errors as in its prior protests. AR 109-2886. Again, GAO dismissed the protest. AR 112-3059 (*National Air Cargo Grp., Inc.*, B-411830.2, 2016 CPD ¶ 85, 2016 WL 1055743 (Comp. Gen. Mar. 9, 2016) ("Second GAO Decision")). Unlike GAO's first decision, which dismissed the protest on the policy ground that GAO would not hear protests to decrease competition, the second GAO decision dismissed National's protest for failing to satisfy the standing requirements of 4 C.F.R. § 21.0(a)(1), which provides that "a protester must be an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of a contract or the failure to award a contract." Second GAO Decision at 4. GAO summarily concluded that a "protester is not an interested party where it would not be in line for contract award were its protest to be sustained." *Id.*

On March 21, 2016, National responded to GAO's dismissal by again filing a protest in this court, making the same allegations as in its prior complaint. On March 22, 2016, the court held an initial status conference and set an expedited schedule by which the government would file a motion to dismiss for lack of jurisdiction and simultaneously National would request a temporary restraining order or preliminary injunction. United was granted leave to intervene. Order of March 24, 2016, ECF No. 10. On April 28, 2016, the court denied both the defendants' motions to dismiss and plaintiff's request for preliminary and temporary injunctive relief. *National Air Cargo Grp., Inc. v. United States*, 126 Fed. Cl. 281 (2016). The court then set a schedule by which the government would file the administrative record and the parties would submit and brief cross-motions for judgment on that record. As of July 27, 2016, TRANSCOM had awarded at least one task order to each of the six awardees. Hr'g Tr. 26:11-14 (July 27, 2016).

**JURISDICTION**

The court has "jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a [f]ederal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or *any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.*" 28 U.S.C. § 1491(b)(1) (emphasis added). This grant of jurisdiction covers not only "pre- and post-award bid protests" but any alleged violation of law "in connection with a procurement." *RAMCOR Servs. Grp., Inc. v. United States*, 185 F.3d 1286, 1288-89 (Fed. Cir. 1999). The latter provision is "very sweeping in scope. As long as a statute has a connection to a procurement proposal, an alleged violation suffices to supply jurisdiction." *Id.* at 1289.

In the government's and United's motions to dismiss for lack of subject matter jurisdiction, they made two facial, as contrasted to factual, arguments that National's case was

not within the court's subject matter jurisdiction.[6]  First, they argued that because National was a contract awardee in a multiple-award IDIQ contract pool, it categorically could not file a bid protest under Paragraph 1491(b)(1) and was instead required to proceed according to the Contract Disputes Act of 1978 ("CDA").  Def.'s Mot. to Dismiss at 4-5, ECF No. 11.  Second, they asserted that National had suffered no cognizable injury, and therefore was not an "interested party" within the meaning of Paragraph 1491(b)(1).  Id. at 5-6.  Owing to these facial arguments, the court permitted the government to abstain from filing the agency's procurement record while the court resolved these preliminary cross-motions.  Notably, facial challenges can be decided without an administrative record, whereas factual challenges often can be resolved only by reference to the record.  E.g., Blue Dot Energy Co. v. United States, 61 Fed. Cl. 548, 554 (2004) (denying a factual motion to dismiss pursuant to RCFC 12(b)(1) because such a motion was "more appropriately resolved at the summary judgment stage").

The court denied the defendants' motions to dismiss, National Air Cargo, 126 Fed. Cl. at 289-96, holding first that National had non-frivolously alleged a violation of procurement law "in connection with a procurement" within the meaning of Paragraph 1491(b)(1), not a claim under the CDA.  Id. at 289-92 (citing Systems Application & Techs., Inc. v. United States, 691 F.3d 1374, 1381 (Fed. Cir. 2012); Distributed Solutions, Inc. v. United States, 539 F.3d 1340, 1345 n.1 (Fed. Cir. 2008)); see also Coast Prof'l, Inc. v. United States, __ F.3d __, __, 2016 WL 3734671, at *4 (Fed. Cir. July 12, 2016) (holding that, in the context of a General Services Administration schedule contract, which is a type of IDIQ contract, an existing contractor's challenge to an award-term extension was a bid protest claim under Paragraph 1491(b)(1), not a CDA claim).  Second, the court determined that National had standing as an "interested party" within the meaning of Paragraph 1491(b)(1).  National Air Cargo, 126 Fed. Cl. at 296.  The court held that the traditional "substantial chance" test for prejudice was inapposite due to the nature of National's protest; instead National's standing should be analyzed by asking whether National had demonstrated a non-trivial competitive injury that could be redressed by judicial relief.  Id. at 290-96 (citing Systems Application, 691 F.3d at 1382; Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1361 (Fed. Cir. 2009)).  The court then held that National had established such an injury for the purpose of overcoming a facial motion under RCFC 12(b)(1), based on its allegations and on the parties' agreement that United would add significant competition to the task order pool.  Id. at 297 ("In short, National has alleged violations of procurement law and

---

[6]Motions to dismiss pursuant to RCFC 12(b)(1) "come in two different forms – facial and factual attacks."  2 James Wm. Moore, Moore's Federal Practice § 12.30[4], at 12-45 (3d ed. 2012).  "A facial attack questions the sufficiency of the pleading.  In reviewing a facial attack, a trial court accepts the allegations in the complaint as true.  On the other hand, when a court reviews a complaint under a factual attack, the allegations have no presumptive truthfulness, and the court . . . has discretion to allow affidavits, documents, and even a limited evidentiary hearing to resolve disputed jurisdictional facts."  Id.; see Land v. Dollar, 330 U.S. 731, 735 & n.4 (1994); Rocovich v. United States, 933 F.2d 991, 993 (Fed. Cir. 1991); Rollock Co. v. United States, 115 Fed. Cl. 317, 324 (2014); see also Odyssey Marine Exploration, Inc. v. Unidentified Shipwrecked Vessel, 657 F.3d 1159, 1169-70 (11th Cir. 2011); Montez v. Department of the Navy, 392 F.3d 147, 149 (5th Cir. 2004).

regulations that bring its protest within the ambit of Paragraph 1491(b)(1), and its *allegations of harm* suffice to establish its standing to sue.") (emphasis added).[7]

After those motions to dismiss were resolved, the government filed the administrative record, and the case has now proceeded with the submission of dispositive motions based on that record. *See Bannum*, 404 F.3d at 1356 (explaining that bid protest proceedings call for a "trial on a paper record"). At this final stage, the defendants have not asked the court to revisit jurisdiction based on the factual record, although they could have done so. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) ("At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim. . . . [But] at the final stage, those facts (*if controverted*) must be supported adequately by the evidence adduced at trial.") (emphasis added) (quotation marks and citations omitted). While the defendants have asserted in their briefs that National did not suffer prejudice on the merits, those arguments are expressly directed at "prejudic[e]" under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, not jurisdictional prejudice. *E.g.*, Def.'s Reply at 2-3, ECF No. 52 (arguing National did not suffer merits prejudice). *Compare Information Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (discussing jurisdictional prejudice), *with Bannum*, 404 F.3d at 1357 (discussing merits prejudice pursuant to the standards of 5 U.S.C. § 706, which sets out a "rule of prejudicial error"). *See also Digitalis Educ. Solutions, Inc. v. United States*, 97 Fed. Cl. 89, 93 (2011) ("A protestor must demonstrate prejudice twice: first to establish standing and then again to prevail upon the merits."), *aff'd*, 664 F.3d 1380 (Fed. Cir. 2012); *PGBA, LLC v. United States*, 60 Fed. Cl. 196, 220-21 (2004)

---

[7]When analyzing a similar "interested" party statute, the Supreme Court has held that increased competition was sufficient to confer statutory standing on a competitor seeking judicial review of agency action. *See F.C.C. v. Sanders Bros. Radio Station*, 309 U.S. 470, 477 (1940) (interpreting Section 402(b) of the Communications Act of 1934, 47 U.S.C. § 402(b), which permitted an appeal by parties "whose interests are adversely affected" by the F.C.C.'s grant of a license, and explaining "[Congress] may have been of opinion that one likely to be financially injured by the issue of a license would be the only person having a sufficient interest to bring to the attention of the appellate courts errors of law in the action of the [F.C.C.] in granting the license."). The Supreme Court further commented that although increased competition would confer standing on a competitor, that increased competition was not a meritorious reason to reverse the F.C.C.'s granting of that license; instead, the competitor-plaintiff would need to show that the F.C.C. had violated some provision of law. *Id.* at 476-77. A long line of cases support that distinction. *E.g.*, *Association of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 157-58 (1970) (holding that competitors, who alleged that an agency's action had increased competition, were "aggrieved" persons pursuant to Section 702 of the Administrative Procedure Act, 5 U.S.C. § 702, but that whether they had a "legal interest" under the relevant substantive statutes was a "merits" determination to be decided in subsequent proceedings); *see also Canadian Lumber Trade Alliance v. United States*, 517 F.3d 1319, 1332 (Fed. Cir. 2008) (discussing how increased competition can be an Article III injury-in-fact); *Louisiana Energy & Power Auth. v. F.E.R.C.*, 141 F.3d 364, 367 (D.C. Cir. 1998) ("We repeatedly have held that parties suffer constitutional injury in fact when agencies lift regulatory restrictions on their competitors or otherwise allow increased competition.").

(finding that a protestor was prejudiced by the procuring agency's errors in making an award of a contract, but denying equitable relief), *aff'd*, 389 F.3d 1219 (Fed. Cir. 2004). Because the defendants do not contest jurisdiction by reference to the factual record, the court pauses only briefly to find that the factual record generally proves National's allegations that it is an actual bidder who will suffer a non-trivial competitive injury in the form of significantly increased competition for task orders.[8] And as noted, United is participating in the task order pool and has received a task order. Hr'g Tr. at 26:11-14. These factual circumstances suffice to support a finding of jurisdictional prejudice. *Cf. Tinton Falls Lodging Realty, LLC v. United States*, 800 F.3d 1353, 1360 (Fed. Cir. 2015) (finding jurisdictional prejudice in a post-award context where "none of the parties disputes the Claims Court's finding that [it was] at least a realistic possibility" that the government would reopen the competition on remand so that the plaintiff could bid).[9]

One jurisdictional issue remains. United now makes a facial argument that the court lacks jurisdiction to hear National's claim that the government violated the "reopening" provisions of the solicitation. United specifically disclaims making a jurisdictional challenge to the other aspects of National's complaint, asserting that

> Sections IA, II, and III of National's [motion] all challenge the reasonableness of the agency's selection of United as the sixth awardee. However, in section IB, [which alleges the government "reopened" the competition in violation of the RFP], National is focused . . . not on the selection of an additional vendor, but on the method by which such selections occur. This argument has no nexus to the injury that allowed National to press its claim before this [c]ourt. From an injury perspective, the result is the same regardless of whether vendors are added through the process National envisions (a new, competitive procurement) or the process the agency followed.

Def.-Interv.'s Cross-Mot. for Judgment on the Administrative Record at 10, ECF No. 48. National counters that the RFP required the government to find a "shortfall" before adding additional contractors. Pl.'s Mot. at 13-14. National further argues that the government did not find such a "shortfall." *Id.* Assuming National is correct, the RFP's recompetition provision would have forbidden the government from adding United, or any other contractor, to the pool unless TRANSCOM found a shortfall. Thus the result would not have been "the same" whether or not the government followed the recompetition procedure.

---

[8]The parties agreed earlier in this case that the increased competition would be significant, *National Air Cargo*, 126 Fed. Cl. at 295, and they have not disavowed that agreement at this final stage. *See Weeks Marine*, 575 F.3d at 1359-60 (giving minimal factual analysis to whether plaintiff was a "prospective bidder" after the government "concede[d]" that plaintiff was a prospective bidder as a matter of fact).

[9]The record also suggests that National could be harmed by flight delays resulting from increased "Prior Permission Requests" at CENTCOM airports, AR 12-305, although no party has raised this issue.

For the reasons stated in the court's earlier opinion, *National Air Cargo*, 126 Fed. Cl. at 289-96, and for the additional reasons discussed below, the court concludes that United's partial standing contention is unavailing and that the court has jurisdiction to resolve all claims in this protest.

## STANDARDS FOR DECISION

This court reviews agency procurement decisions "pursuant to the standards set forth in section 706 of title 5 [the APA]." 28 U.S.C. § 1491(b)(4). The cited section "provides, in relevant part, that a 'reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (quoting 5 U.S.C. § 706)). Accordingly, the court may set aside a procurement action under Paragraph 1491(b)(4) if "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001). Of particular relevance to this case, "[i]t is hornbook law that agencies must evaluate proposals and make awards based on the criteria stated in the solicitation." *Banknote Corp. of Am., Inc. v. United States*, 56 Fed. Cl. 377, 386 (2003), *aff'd*, 365 F.3d 1345 (Fed. Cir. 2004). Interpretation of a solicitation is a question of law, and it begins with the plain language of the document. *Banknote Corp.*, 365 F.3d at 1353. The court "must consider the solicitation as a whole, interpreting it in a manner that harmonizes and gives reasonable meaning to all of its provisions." *Id.* (citing *Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1038 (Fed. Cir. 2003) (*en banc*)).

In cases where the agency has taken corrective action that resulted in a new evaluation and source selection decision, the court must review the agency's new decision. *Tenica & Assocs., LLC v. United States*, 123 Fed. Cl. 166, 171 (2015). The initial agency decision typically will not present a live controversy after corrective action, making moot those errors alleged in an initial decision. *Id.* (citing *Coastal Envt'l Grp., Inc. v. United States*, 114 Fed. Cl. 124, 129 (2013)). Nonetheless, the initial procurement decision will continue to present a live controversy to the extent errors in the original evaluation have gone unresolved during corrective action, cannot be fixed in corrective action, or otherwise continue to affect the decision made by the agency. *E.g., Croman Corp. v. United States*, 106 Fed. Cl. 198, 213 (2012) ("Plaintiff also challenged the agency's corrective action as being insufficient to cure the alleged errors committed by the agency in the initial evaulations . . . . Plaintiff's objection . . . is not moot.").

## ANALYSIS

National makes three overall arguments. First, it asserts that when TRANSCOM sent an "unsuccessful offeror" letter to United on June 11, 2015, that letter operated to terminate TRANSCOM's power to accept United's offer, meaning United could not be awarded a contract unless TRANSCOM found a "shortfall" and then reopened the competition pursuant to the RFP's recompetition provisions. Second, National contends that even if United's offer remained valid, TRANSCOM could not award six contracts during corrective action because that number of awards would violate the "approximately four" awards limitation in the RFP. Finally,

National argues that TRANSCOM's best value analysis during corrective action was arbitrary and capricious because it irrationally concluded that United's minimal past performance history could be offset by its low price. The court addresses each argument in turn.

### A. Whether TRANSCOM Terminated Its Power to Accept United's Offer When TRANSCOM Sent an "Unsuccessful Offeror" Letter to United

National asserts that United's offer expired when TRANSCOM informed United by letter on June 11, 2015 that it would not receive an award. Pl.'s Mot. at 14. If National is correct, then TRANSCOM could not have accepted United's offer on July 15, 2015, nor at any other time, without reopening the competition pursuant to the recompetition provisions. AR 14-372. This would also, in National's view, nullify the corrective action.

In this case, the parties have implicitly assumed that the government's RFP was a solicitation for an offer. *See Space Research Corp. v. United States*, 225 Ct. Cl. 721, 722 (1980) (holding that an RFP was a solicitation, not an offer). The RFP contained specific terms to which an offeror would need to adhere for the government to consider that offeror's proposal. *See, e.g.*, *Refining Assocs., Inc. v. United States*, 124 Ct. Cl. 115, 117 (1953) (examining whether an offeror's offer was valid by analyzing whether it complied with the terms of an invitation for bids). Thus to resolve plaintiff's claim, the court begins with the solicitation's plain language. *Banknote*, 365 F.3d at 1353. The solicitation provided that "[t]he offeror agrees to hold the prices in its offer firm for 180 calendar days from the date specified for receipt of offers." AR 14-406. This provision was adapted from FAR § 52.212-1(c), entitled "period of acceptance of offers," which subsection specified a 30-day acceptance period, but that timing was modified in the solicitation to 180 days. The date designated for receipt of offers was March 16, 2015. AR 14-321. Further, the RFP established that "[b]efore the offer's specified expiration time, the [g]overnment may accept an offer (or part of an offer), whether or not there are negotiations after its receipt, unless a written notice of withdrawal is received before award." AR 14-410 (quoting FAR § 52.212-2(c)). Taken as a whole, these provisions plainly mean that TRANSCOM could have accepted offers and formed a contract at any point during 180 days, unless the offeror withdrew its offer. *Accord WIT Assocs., Inc. v. United States*, 122 Fed. Cl. 1, 12 (2015), *aff'd*, __ Fed. Appx. __, 2016 WL 4363179 (Fed. Cir. Aug. 16, 2016).

By stating that offers would remain extant until withdrawn or 180 days had expired, the FAR and the solicitation invoked the traditional "firm offer" rule, by which an offeror would be held to his or her offer even if the offeree rejected it or made a counteroffer. *See Black's Law Dictionary* 1113 (2004) (providing a definition of "irrevocable offer," referencing the "firm offer" rule); *see also Restatement (Second) of Contracts* § 37 (1981) (observing that although an offeree's power of acceptance is generally terminated by a rejection, at common law a promise to hold offers firm would be an option contract for which the offeree's "power of acceptance" is "not terminated by rejection or counter-offer . . . unless the requirements are met for discharge of a contractual duty"); *International Tel. & Tel., ITT Defense Commc'ns Div. v. United States*, 453 F.2d 1283, 1290-91 (Ct. Cl. 1972) ("The offeror's limitation of the time is not operative if it is not communicated to the offeree . . . but if so communicated it operates with certainty." (quoting

1 Arthur L. Corbin, *Corbin on Contracts* § 35 (1963 ed.))).[10]  In this instance, the "firm offer" rule was relaxed slightly by FAR § 52.212-2(c) because the offeror retained power to withdraw its offer.  Here, United continuously held its offer open after TRANSCOM's letter of June 11, 2015, as evidenced by United's agency-level bid protest.  In short, its offer was never withdrawn.[11]  National cites no authority for the proposition that a government contractor's offer in a negotiated procurement is terminated by a rejection letter even when that contractor continues to hold out its offer.  Such a rule would make corrective action problematic in many post-award circumstances and thus cannot be accepted.

*B. Whether TRANSCOM Awarded More than "Approximately Four" Awards*

National argues that TRANSCOM could not award six contracts because the RFP limited the number of awards to "approximately four."  Pl.'s Mot. at 12.  The relevant solicitation language provides: "[t]he [g]overnment intends to award approximately four (4) IDIQ contracts resulting from this solicitation to provide [g]overnment shippers flexibility of choice and service coverage."  AR 14-329.  In this court's opinion denying National's motion for a preliminary injunction, the court made the following assessment of National's theory:

> In this context, the word "approximately" generally means "nearly exact" or nearly "accurate."  *Webster's II New College Dictionary* 56 (2001).  It does not mean "precisely" or "exactly."  The phrase "approximately four" therefore permits the government to award more than four contracts.  National appears to concede this point, because it does not challenge the fifth contract award.  Instead, it challenges only the sixth award, which went to United.  The question then is whether "approximately four" means "not more than five."  Plaintiff cites no authority – no definitions in the solicitation or regulations – to explain why "approximately four" should have such meaning.

*National Air Cargo*, 126 Fed. Cl. at 298.  National's brief on the merits has not assuaged the court's concerns.  National's briefing makes no textual argument that "approximately four" must be interpreted as it advocates.  Pl.'s Mot. at 12-13 (citing no canons of interpretation, statutes, regulations, or case law to support its argument).  Instead, National concedes that this term is

---

[10]Even if the solicitation or the FAR might be read as silent on this issue, the federal common law of contracts could fill that gap, assuming that effective administration of the FAR were to be deemed to require a uniform federal rule.  *See United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 726-28 (1979) (citing *Clearfield Trust Co. v. United States*, 318 U.S. 363, 366-67 (1943)).

[11]When the time for accepting an offer expires, "an offeror may 'revive the offer either expressly or impliedly through conduct' but 'only if such revival does not compromise the integrity of the competitive process or prejudice other offerors.'"  *WIT Assocs.*, 122 Fed. Cl. at 14 (quoting *Camden Shipping Corp. v. United States*, 89 Fed. Cl. 433, 440 (2009) (in turn citing *Rice Servs., Ltd. v. United States*, 25 Cl. Ct. 366, 368 (1992) (internal citations omitted)).  United's conduct – including its agency-level protest – shows that its offer was continuously held out to the government, and National has made no argument that any such continuation would prejudice the integrity of the procurement system.

"admittedly ambiguous on its face." Pl.'s Mot. at 13. National then argues that the agency's initial June 2015 determination to award five contracts amounts to an agency determination that "approximately four" means "five," which meant that the agency subsequently "revers[ed] itself" by making six awards during corrective action. Pl.'s Mot. at 13. But that argument is not convincing even though TRANSCOM did "reverse itself" by making six awards during corrective action; that was TRANSCOM's prerogative so long as its decision complied with the solicitation and applicable law. Here, TRANSCOM justified its reversal by making findings that "six" awards were "approximately four" and that this number of awards was in its interest, *compare* AR 71-1774 (explaining why TRANSCOM was making five awards), *with* AR 103-2853 (explaining why TRANSCOM was making six awards), and National has not disputed those underlying findings. As noted previously, TRANSCOM had cited congestion at CENTCOM airports as a basis for the "approximately four" awards limitation, AR 12-305, and National does not address how six awards might affect that congestion. *See Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434 (2010) (explaining that in "our adversarial system," the "courts are generally limited to addressing the claims and arguments advanced by the parties. . . . Courts do not usually raise claims or arguments on their own.") (citing *Sanchez–Llamas v. Oregon*, 548 U.S. 331, 356–357 (2006)). The mere fact that the agency changed course does not prove that its revised action was arbitrary. *See F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 514-15 (2009).

### C. Whether TRANSCOM Arbitrarily Evaluated Offerors for Best Value, Owing to Its Review of the Offerors' Past Performance

National's final argument is that TRANSCOM's corrective action was arbitrary. National points to the fact that TRANSCOM's past performance rating for United did not change between the initial evaluation in 2015 and the corrective action in 2016 – both evaluations gave United a "limited confidence" rating – yet the corrective-action decision found that this limited confidence rating was offset by United's low price. Pl.'s Mot. at 16-17. National's factual premises for this argument are fully supported by the record. *Compare* AR 102-2831 (corrective action, giving United a limited confidence rating), *with* AR 71-1769 *and* AR 67-697 (initial evaluation, same). Even so, the government's re-evaluation of "best value" in 2016 was more extensive and considered additional matters that were not raised in the 2015 analysis. In the initial analysis, the government decided that United did not provide the best value, despite the fact that it offered the lowest evaluated price. AR 71-1773. This initial analysis may have ignored the solicitation's direction that past performance was equal to price, and it also may have failed to consider the task order context. But during corrective action, the government determined United did offer the requisite value. The SSAC wrote in 2016 that "this weighting was determined appropriate because performance risk is mitigated by competition at the task order level." AR 103-2853. The SSAC observed that "the Ordering Procedures for task order award" would include "consider[ation of] performance metrics captured on a monthly basis." AR 103-2850 to -51.

National insists that TRANSCOM's conclusion – that United offered appropriate value on the basis that "performance risk is mitigated by competition at the task order level" – is arbitrary and capricious. Pl.'s Mot. at 17. When applying the APA's arbitrary and capricious standard to a best value procurement, that standard will as a matter of practicality but not as a

matter of law be more difficult to satisfy than in cases involving other procurement criteria, because a best value procurement inherently calls for the contracting officer to exercise his or her discretion. *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996) ("Procurement officials have substantial discretion to determine which proposal represents the best value for the government."); *see also Serco Inc. v. United States*, 81 Fed. Cl. 463, 496 (2008) ("To be sure, . . . plaintiffs have a significant burden of showing error in [contesting a best-value decision] because a court must accord considerable deference to an agency's best-value decision in trading off price with other factors."). Here, National has not met its burden. The court discerns no irrationality in TRANSCOM's trade off analysis during corrective action. It is rational to think that somewhat higher performance risk could be offset by a considerably lower price, especially when price and past performance were weighted equally. *E.g.*, *Blackwater Lodge & Training Ctr., Inc. v. United States*, 86 Fed. Cl. 488, 515 (2009). And, it is sensible for the agency to conclude that United's past performance risks could be shown to have been overstated, or not, by United's actions in carrying out task orders awarded on this contract. If United performed poorly on the task orders it received, that performance would be an obstacle to award of additional task orders in the future; if it performed well, then the government would have access to a low-priced provider of shipping services.[12]

National's final rejoinder is that the contracting officer "sought an expedient end to a protest by U[nited] and simply made another award." Pl.'s Mot. at 18. That contention is unavailing. The corrective action followed a reasoned analysis of why United's limited past performance was offset by its low price in the task order context. This is not a case in which the agency simply bolstered its initial findings during corrective action so as to prevail in a bid protest. Rather, the court concurs with United that it was likely inappropriate for the agency to *not* make an award to United on these facts.

## CONCLUSION

National's motion for judgment on the administrative record is DENIED. The government's and United's cross-motions for judgment on the administrative record are GRANTED. The clerk shall enter judgment in accord with this disposition.

No costs.

It is so **ORDERED**.

s/ Charles F. Lettow
Charles F. Lettow
Judge

---

[12]National asserts that TRANSCOM had previously determined that United was not a responsible contractor. Pl.'s Mot. at 18. That factual assertion is not supported by the record.